## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LAWRENCE LATTUCA, individually and on behalf of all others similarly situated, | **Case No.** 1:21-cv-03122-SJC |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| JOHN PAUL MITCHELL SYSTEMS, | |
| Defendant. | |

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Lawrence Lattuca, on behalf of himself and all others similarly situated, brings this First Amended Class Action Complaint ("FACAC" or "FAC") against Defendant, John Paul Mitchell Systems ("Paul Mitchell" or "Defendant"), and alleges on personal knowledge, investigation of his counsel, and on information and belief as follows:

### NATURE OF THE CASE

1.    This is a nationwide class action brought by Plaintiff on behalf of himself and other similarly situated consumers who purchased Paul Mitchell branded Tea Tree Hair and Body Moisturizer (the "Product") for personal or household use and not for resale ("Class" or "Class Members"). As alleged herein, Defendant made material misrepresentations and omissions regarding the Product. By purchasing the mislabeled and misrepresented Product, Plaintiff seeks equitable damages for himself and on behalf of the Class.

2.    Defendant designs, formulates, produces, manufactures, sells, and distributes the

Product throughout the United States. The Product is sold online at Paul Mitchell's website, in professional salons, and through its authorized online retailers, which include Ulta, JCPenney, and Amazon.

3.      Paul Mitchell's hair care products are marketed as the best in professional hair care, using "the highest-quality ingredients and the latest technologies."[1]

4.      Through its uniform, widespread, nationwide advertising campaign, Defendant has led consumers to believe that the Product cools, rejuvenates, and hydrates skin; quenches dry hair; and moisturizes both the hair and body.

5.      Through its uniform, widespread, nationwide advertising campaign, Defendant has led consumers to believe that the Product is free from skin and scalp irritants with its claims of being "paraben and sulfate free."

6.      The labeling of the Product similarly assures consumers of its safety when it states that the Product is "*ideal for all hair and skin types*."

7.      In reality, the Product contains DMDM hydantoin, a preservative ingredient that releases formaldehyde – a known human carcinogen – for absorption into the scalp during every use/exposure.

8.      Defendant has continued to use DMDM hydantoin in the Product despite its actual knowledge that the ingredient releases formaldehyde and is unsafe to consumers, which directly contradicts its uniform representations that the Product is safe and "ideal" for use by consumers of "all hair and skin types."

9.      California recently banned the use of formaldehyde in beauty products. Maryland

---

[1] https://www.paulmitchell.com/company/our-product (Last Accessed April 27, 2023.)

passed a similar law. Regulations to implement the laws in both states will begin in 2025.

10.     Nowhere on the package labeling or on Defendant's websites or other marketing materials did Defendant warn or otherwise represent to Plaintiff and members of the Class that they were at risk of repeated formaldehyde exposure upon proper application of the Product. Accordingly, Defendant misled and deceived the public, placing its customers in harm's way, all for the sake of increased profits.

11.     Defendant knew but failed to disclose to Plaintiff and the Class that they would be repeatedly exposed to formaldehyde due to the inclusion of one or more ingredients in the Product, specifically DMDM hydantoin.

12.     Defendant failed to properly warn consumers of the risks and dangers attendant to the use of the Product – namely, being repeatedly exposed to formaldehyde, a known human toxicant– even well after Defendant knew or should have known of the Product's ingredients and inherent risks. Defendant continued to conceal the dangers of the Product by failing to recall the Product, and otherwise claim it is safe for "all hair and skin types" when properly applied.

13.     Furthermore, reasonable consumers, including Plaintiff, who purchased the Product and used the Product as intended on a daily basis would consider the risk of exposure to formaldehyde, no matter the amount, a material fact when considering whether to purchase the Product.

14.     As a result of Defendant's misrepresentations and omissions, Plaintiff and the Class were all unknowingly and repeatedly exposed to formaldehyde, and they have suffered actual monetary damages by purchasing Products that contain a formaldehyde releasing ingredient.

15.     The misrepresentations and omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Product that omitted

material information as to the Product's true quality and value.

16.     Given the massive quantities of the Product sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed monetary relief for those affected.

17.     Plaintiff brings this suit to halt the unlawful sales and marketing of the Product by Defendant and for damages sustained as a result.

## PARTIES

18.     Plaintiff Lawrence Lattuca is and was at all times relevant to this matter a resident and citizen of the state of Illinois, residing in Orland Park, IL, in Cook County.

19.     Defendant John Paul Mitchell Systems is a corporation organized, existing, and doing business under and virtue of the laws of the state of California with its office and principal place of business located at 20705 Centre Point Pkwy in Santa Clarita, California. At all times Defendant manufactured, marketed, designed, promoted and/or distributed the Product nationwide, including in Illinois.

## JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over Defendant in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time

4

period, at which time Defendant was engaged in business activities in the state of Illinois.

21.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Product in this District.

## FACTUAL ALLEGATIONS

### Defendant's Business

23.     Paul Mitchell was established in 1980 with the purported mission of providing luxury hair care at an affordable price. The company began by selling three hair care products; as of 2018 its line had expanded to more than 80 products.[2]

24.     The global haircare market was worth $85.5 billion dollars in 2017 and is expected to exceed $102 billion dollars by 2024.[3] Paul Mitchell's annual sales are estimated at $510 million.[4]

---

[2] https://money.cnn.com/2018/04/09/news/companies/john-paul-dejoria-rebound/index.html (Last Accessed April 24, 2023.)
[3] https://www.statista.com/topics/4552/hair-care-product-market-in-the-us/
[4] https://www.happi.com/contents/view_top-companies-report/2020-07-01/27-john-paul-mitchell-systems-816580/ (Last Accessed April 24, 2023.)

25. Recognizing that consumers, including Plaintiff, will pay a premium for natural and environmentally conscious products, Paul Mitchell markets its company as "eco-conscious and environmentally friendly…continually searching for sustainable ingredients."[5]

26. Paul Mitchell's haircare products are organized into several different brands and/or collections, including Tea Tree, Marula Oil, and Awapuhi Wild Ginger.

27. Many of Paul Mitchell's products contain natural ingredients, such as essential oils, which purportedly provide different benefits for the hair and skin.

***Formaldehyde Donors and DMDM Hydantoin***

28. In addition to potentially beneficial ingredients like essential oils, nearly all hair care products contain preservatives. This is because cosmetics and personal care items containing water in their formulations, such as shampoo, are subject to spoilage and microbial growth. Preservatives inhibit that bacterial growth and extend shelf life.[6]

29. There are a variety of synthetic and natural preservatives which may be used in cosmetics.

30. Formaldehyde donors, also known as formaldehyde releasing preservatives ("FRP"s), are one form of preservative used in cosmetic products.

31. Formaldehyde is a colorless, flammable, strong-smelling chemical that is commonly used as an industrial fungicide, germicide, and disinfectant, as well as a preservative in mortuaries and medical laboratories.[7]

---

[5] https://www.paulmitchell.com/company/our-product (Last Accessed April 24, 2023.)
[6] "A Guide to Cosmetic Product Preservatives." The Eco Well. May 11, 2019. https://www.theecowell.com/blog/preservatives1 (Last Accessed April 24, 2023
[7] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet (Last Accessed April 24, 2023.)

32.     Formaldehyde donors continuously release small amounts of formaldehyde, which in turn prevents microbial growth in products such as cosmetics.[8] The reactions that generate formaldehyde occur as the products sit on shelves in stores or bathroom cabinets;[9] there is nothing a consumer can do to mitigate the release of formaldehyde in products containing formaldehyde donors.

33.     Formaldehyde donors are known to slowly leach formaldehyde after coming into contact with water.

34.     Formaldehyde donors can be absorbed through the skin and have been linked to cancer and adverse skin reactions.[10]

35.     Formaldehyde is a known human carcinogen, as recognized by the United States National Toxicology Program and the International Agency for Research on Cancer.

36.     One study performed in 1987 specifically examined whether the presence of DMDM hydantoin in cosmetics could cause adverse effects in patients pre-sensitized to formaldehyde.[11] The conclusion even more than twenty years ago was that when used in concentrations comparable to those in cosmetic products, DMDM hydantoin contained enough free formaldehyde to cause dermatitis, or skin irritation.[12] Based on the study's findings, the authors suggested that cosmetic products with FRPs should have warnings that the products "'contain formaldehyde'… whether present as free formaldehyde or bound by a donor."[13]

---

[8] https://davidsuzuki.org/queen-of-green/dirty-dozen-formaldehyde-releasing-preservatives/ (Last Accessed April 24, 2023.)

[9] https://www.ewg.org/research/exposing-cosmetics-cover-up#formaldehyde (Last Accessed April 24, 2023.)

[10] https://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed April 24, 2023.)

[11] *Id.*

[12] *Id*.

[13] *Id.*

37.    The prevalence of dermatitis caused by DMDM hydantoin is well documented. The U.S. Food & Drug Administration considers DMDM hydantoin one of the top allergens "that cause the most allergic reactions from the use of cosmetic products."[14]  Further, the North American Contact Dermatitis Group ("NACDG") Standard Series, a screening method for diagnosing a skin contact allergy, listed DMDM hydantoin as the 21st most common allergen in the 2005-2006.[15]

38.    Further, a study in 2010 concluded that individuals could experience allergic reactions to not only the formaldehyde released by formaldehyde donors, but the formaldehyde donors themselves—including DMDM hydantoin, which was found to be "reactive per se."[16]

39.    DMDM hydantoin causes reactions when the immune system is triggered to release chemical substances such as antibodies, resulting in reactions including itchiness, red rashes on the skin, or more extreme reactions.[17]

40.    Dermatitis can also occur on the scalp and has been linked to hair brittleness and hair loss. Specifically,

> A number of observations have found that premature hair loss may be caused by the poor scalp health associated with either dandruff and seborrheic dermatitis, or psoriasis, indicating that the effect on the preemergent hair fiber may alter the anchoring force of the fiber with the follicle, as evidenced by an increased proportion both of catagen and telogen, and of dysplastic anagen hairs (anagen hairs devoid of hair root sheaths) in the trichogram (hair pluck).[18]

---

[14] https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (Last Accessed April 24, 2023.)

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195 (citing Rietschel RL, Fowler JF., Jr . Fisher's Contact Dermatitis. 5th ed. Philadelphia: Lippincott Williams & Wilkins; 2001).

[16] Kireche M, Gimenez-Arnau E, Lepoittevin JP. Preservatives in cosmetics: reactivity of allergenic formaldehyde-releasers towards amino acids through breakdown products other than formaldehyde. Contact Dermatitis. 2010 Oct;63(4):192-202. doi: 10.1111/j.1600-0536.2010.01770.x. Epub 2010 Aug 20. PMID: 20731691.

[17] https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (Last Accessed April 24, 2023.)

[18] Trueb, Ralph M., Henry, Jim P., Davis, Mike G., and Schwartz, Jim R., Scalp Condition Impacts Hair Growth and Retention via Oxidative Stress, Int J Trichology. 2018 Nov-Dec; 10(6): 262–270, doi: 10.4103/ijt.ijt_57_18.

***The Paul Mitchell Product***

41.     The Product at issue in this case, Tea Tree Hair and Body Moisturizer, is labeled as a "Leave-in conditioner." The Product's front of package label is reproduced below:



42.     On Paul Mitchell's website, the Product is described as a "multi-tasking moisturizer" that can be used as a body lotion, leave-in conditioner, or a post-shave soother.[19]

43.     Tea tree oil is believed to be antibacterial, and is commonly used in many over-the-

---

[19] *Id.*

counter beauty products to treat conditions such as acne and dandruff.[20]

44.     Paul Mitchell's Tea Tree line of products is uniformly marketed as a natural choice for preventing or treating itchy, dry scalp[21] and creating a cooling, "tingling" sensation on the scalp as a result of its famous "Tingle Complex," a blend of tea tree, peppermint, and lavender.[22]

45.     The website further claims that the Product "soothes," "rejuvenates," and "hydrates" skin, in addition to conditioning hair by "quench[ing] dry, thirsty strands."

46.     Consumers are directed to use the Product the same way as a normal hair conditioner, by applying a small amount to clean, damp hair.

47.     When using the product as a body moisturizer, consumers are directed to massage the Product into the skin to "refresh and moisturize."

48.     The Product is further marketed on Defendant's website and on retailer websites as "Ideal for All Hair and Skin Types" and "Paraben Free" and "Sulfate Free".[23]

49.     As one of the preeminent manufacturers of high-end hair products, Defendant is well aware of increased consumer demand for "clean" and natural beauty products. Market research demonstrates that consumers are specifically seeking products that are free from potentially harmful chemicals, with more than 24% of U.S. adults seeking "clean" products.[24] Specifically, research has shown a 5% growth in products specifically labeled as being free from

---

[20] https://www.mayoclinic.org/drugs-supplements-tea-tree-oil/art-20364246

[21] https://www.paulmitchell.com/blog/5-tips-for-winter-scalp-care.html (Last Accessed April 24, 2023.)

[22] https://www.paulmitchell.com/tea-tree/tea-tree-special/tea-tree-hair-and-body-moisturizer (Last Accessed April 24, 2023.)

[23] *Id*. *See also* https://www.amazon.com/Tea-Tree-Hair-Moisturizer-10-14/dp/B002FJ11UW?th=1 (Last Accessed April 24, 2023.)

[24] https://nielseniq.com/global/en/insights/education/2021/the-clean-beauty-trend-is-more-than-skin-deep/ (Last Accessed April 26, 2023.)

[24] *Id*.

both parabens and sulfates.[25]

50.     Defendant purposefully chose to market the Product as "Paraben Free" and "Sulfate Free" to drive sales and increase profits by targeting consumers seeking out "clean" hair care products, which are free from potentially harmful chemicals and skin irritants like parabens, sulfates, and DMDM hydantoin. This strategy is bolstered by Defendant's conspicuous advertising of its natural ingredients such as tea tree, peppermint, and lavender.

51.     Moreover, Defendant attempted to mislead Plaintiff and all consumers of the safety of the Product by marketing it as "Ideal for All Hair and Skin Types" despite knowing of the presence of a formaldehyde releasing ingredient.

52.     Based on these representations, reasonable consumers, like Plaintiff, would assume that the Product did not contain a known skin/scalp irritant like DMDM hydantoin.

53.     Based on these representations, reasonable consumers, like Plaintiff, would assume that the Product did not contain a formaldehyde releasing ingredient that could cause an adverse reaction or dermatitis in consumers.

54.     Through its labeling and an extensive, uniform, nationwide advertising and marketing campaign, including its website and online advertisements, Paul Mitchell targeted consumers who wanted to safely refresh, moisturize, and soothe their skin and hair without the risk of skin irritation from harmful ingredients.

55.     Paul Mitchell made a number of express warranties: that the Product will moisturize skin and hair; that the Product will soothe freshly shaved skin; and that the Product will "cool, rejuvenate, and hydrate skin."[26]

---

[25] *Id.*
[26] *Id.*

56.     Paul Mitchell made these warranties despite knowing that all consumers would be exposed to a formaldehyde releasing ingredient, and that some of those consumers would experience skin and scalp irritation, adverse reactions, and hair loss.

57.     Defendant manufactures, advertises, markets, distributes and sells the Product throughout the United States, including in Illinois.

58.     At all times relevant to this action, the Product's formula contained an ingredient, or combination of ingredients, that exposed Plaintiff and thousands of consumers to formaldehyde and to potential hair loss and skin and/or scalp irritation.

59.     DMDM hydantoin is found in the Product as stated on the Product's back label. An example of this back labels is reproduced below:



*Paul Mitchell's Knowledge of the DMDM Problems*

60.    For at least a decade, Paul Mitchell has had knowledge that DMDM hydantoin can cause or contribute to hair loss and scalp irritation when used as a preservative in hair products.

61.    Beginning in 2012, other manufacturers within the hair care industry had begun to eliminate formaldehyde and/or formaldehyde donors them from their products due to consumer concerns.  Beauty product manufacturer Johnson & Johnson announced in 2012 that it would "remove a host of potentially harmful chemicals, *like formaldehyde*, from its line of consumer products by the end of 2015."[27] [Emphasis Added].

62.    Despite having knowledge that DMDM hydantoin can cause or contribute to hair loss and scalp irritation, Paul Mitchell continued to include this ingredient as a preservative in its products, even going so far as to represent to the public:

> "…[O]ur products are researched, formulated and tested (on humans!). From concept to completion, our talented team of in-house chemists work hand-in-hand with licensed hairdressers to develop, test and perfect every formula…"[28]

63.    Furthermore, Paul Mitchell continues to represent that it is transparent with regard to the ingredients in its products, stating, "Transparency is important to us, so you can make an informed purchase."[29] Despite claiming its product pages contain "important information, such as whether the product is vegan, paraben-free, gluten-free or sulfate-free,"[30] Paul Mitchell does not provide the full ingredient list for its products on its website. In order to obtain a list of ingredients for any of Paul Mitchell's products, consumers are directed to contact Technical Support by

---

[27] https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-from-products.html (Last Accessed April 27, 2023.)
[28] https://www.paulmitchell.com/company/our-product (Last Accessed April 24, 2023.)
[29] *Id.*
[30] *Id*.

phone.[31]

64. As Paul Mitchell is aware, there is a litany of alternative preservatives that can be used in shampoos, conditioners, and cosmetics that do not release known human carcinogens and are non-synthetic, including

      a. Glyoxylic acid (or derivatives thereof);

      b. Potassium sorbate and sorbic acid;

      c. Citric acid and its salts;

      d. Rosemary oil extract;

      e. Neem oil extract;

      f. Lavender oil;

      g. Grapefruit seed extract; and

      h. Vinegars.

65. Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong ingredient on their skin, hair, and scalp – even well after Defendant knew or should have known of the Product's hazards. Defendant continued to conceal the dangers of the Product by failing to appropriately and fully recall the Product, by continuing to claim the Product was safe when properly applied, and by failing to warn consumers of the danger attendant to use of the Product.

66. Nowhere on the package labeling or on Paul Mitchell's website or other marketing materials did Paul Mitchell warn Plaintiff and Class members that they were at risk of formaldehyde exposure, hair loss, and/or skin and scalp irritation upon proper application of the Product. Indeed, Defendant specifically assured Plaintiff and Class Members that they would not

---

[31] https://www.paulmitchell.com/faq (Last Accessed April 24, 2023).

be at risk for skin and scalp irritation with its claims of safety and being "paraben and sulfate free".[32]

67.     Paul Mitchell misled and deceived the public, and placed its customers in harm's way, all for the sake of increased profits.

68.     Defendant's uniform acts and omissions in connection with the development, marketing, sale and delivery of the Product violates the consumer protection laws of the states alleged herein, including Illinois and unjustly enriches Defendant.

69.     Although Paul Mitchell has, or should have been aware, of the high potential for adverse reactions caused by one or more of the ingredients in the Product, it has failed and continues to fail to warn consumers about formaldehyde exposure and possible reactions, including hair loss, and scalp irritation. Instead, Paul Mitchell labeled, advertised, promoted and sold the Product targeting consumers who wanted moisturized, hydrated, and soothed skin and hair.

70.     U.S. consumers, including Plaintiff and Class Members, reasonably expect that their hair and skin care products—especially those marketed as healthy, natural, soothing, and ideal for all hair and skin types-- will not lead to formaldehyde exposure and cause hair loss, and skin and/or scalp irritation as the result of defective design and manufacturing or because of inadequate research or due diligence. Accordingly, U.S. consumers had no expectation that the Product would lead to formaldehyde exposure and potentially cause skin reactions, scalp irritation or hair loss.

71.     Further, consumers reasonably expected that if Paul Mitchell, the company primarily responsible for developing, manufacturing, marketing and distributing the Product, knew that the Product would or could lead to formaldehyde exposure and/or hair loss (whether by proper

---

[32] *Id.*

15

application or by misapplication), then Paul Mitchell would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

72. By downplaying, concealing, and misrepresenting safety and risks of the use of the Product, Paul Mitchell failed in its duty to provide consumers with adequate information, and continued, even knowing of the Product's dangers, to create and perpetuate a false public perception that there was little or no risk of harm from the use of its Product.

73. Moreover, as set out more fully herein, Paul Mitchell's efforts to conceal and downplay the hundreds if not thousands of complaints of Class Members who actually lost their hair or endured skin and/or scalp irritation due to formaldehyde exposure as a result of using the Product as intended, comprised a pointed attack on consumers.

74. Defendant failed to properly warn consumers of the risks and dangers attendant to the use of such a strong preservative and human toxicants on their hair and scalp – even well after Defendant knew or should have known of its hazards. Defendant continued to conceal the dangers of the Product by failing to recall the Product, and otherwise claim they are safe when properly applied.

*Consumer Complaints*

75. Since at least 2018, Defendant became aware through hundreds of consumer complaints and anecdotes on various retail websites that some consumers believed that they were suffering adverse reactions that are often associated with repeated formaldehyde exposure from their use of Defendant's Product.

76. Despite the direct and constructive knowledge that Defendant had from scientific studies, as well as hundreds of online consumer complaints and anecdotes, Defendant willfully

chose to continue to deceive consumers regarding the true nature of the products when they had substantial evidence suggesting that the Products were causing repeated formaldehyde exposure and potentially other adverse effects.

*Defendant's Misrepresentations*

77.     Paul Mitchell released the Product more than ten years ago. The Product was sold by Paul Mitchell directly and through professional hair salons and retail shops nationwide, including those in Illinois.

78.     The Product states, on the front of the bottle's label, that the Product is formulated with tea tree oil moisturize the hair and body. The back of the bottles also state: "Ideal for all hair and skin types."

79.     Plaintiff and the Class did not and would not expect that application of the Product would exposure them to formaldehyde and potentially cause hair loss and skin/scalp irritation upon proper application. Indeed, Defendant was sure to stress on its own website and third-party retailer websites that the Product was "Paraben and Sulfate free" in order to convince consumers that they would not be exposed to harmful ingredients that lead to skin and scalp irritation.

80.     Plaintiffs and the Class reasonably expected a warning regarding any potential risks and hazards to consumers, especially because the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings.[33]

81.     The Food and Drug Administration has written about the risks of formaldehyde and formaldehyde donors (like DMDM Hydantoin) in hair care and actively discourages home purchase of hair smoothing products such as Defendants' Products.[34]

---

[33] *See* https://www.fda.gov/cosmetics/cosmetics-labeling-regulations/summary-cosmetics-labeling-requirements (last accessed April 24, 2023).

[34] https://www.fda.gov/consumers/consumer-updates/formaldehyde-hair-smoothing-products-what-

82.     Contrary to the Food, Drug and Cosmetic Act regulations, the Product also failed to provide adequate directions for safe use, although Defendants knew or should have known the Product would be unsafe if used correctly. In response to the damage customers have suffered after using the Product, consumers complained as described herein.

83.     Paul Mitchell continues to this day to advise consumers that this Product is safe to use as directed, without providing any disclosure concerning the exposure to formaldehyde, and with no warnings regarding the skin/scalp irritation or hair loss that may result from their continued use. Indeed, despite Paul Mitchell's knowledge and awareness of hundreds if not thousands of complaints of skin and scalp irritation caused by the Product, Paul Mitchell continues to claim the use of DMDM hydantoin it is safe and permits them to be sold to this day — without providing consumers with *any* revised warnings or disclosures.

84.     The Product is sold at authorized retail and/or e-commerce stores such as Amazon, WalMart, Ulta, and JCPenney. The Product is also sold at hair salons nationwide, including large national salon chains such as Supercuts and Great Clips.

85.     Defendant manufactures, advertises, markets, distributes and sells the Product throughout the United States, including in Illinois. The Product is sold in at least three sizes — 2.5 fl oz., 10.14 fl. oz., and 33.8 fl. oz.

***Defendant's False and Deceptive Advertising and Labeling***

86.     In violation of 21 U.S.C. § 362(a) and 21 C.F.R. § 701.1(b), Defendant has consistently, falsely and deceptively advertised and labeled the Product in an effort to make consumers believe that the Product's ingredients, including DMDM hydantoin, were safe for use.

---

you-should-know?utm_medium=email&utm_source=govdelivery (last accessed April 23, 2023).

87.     Since launching the Product, Defendant has consistently conveyed its uniform, deceptive message to consumers throughout the United States, including in Illinois, that the Product, which is formulated with formaldehyde donors including DMDM hydantoin, is safe for use and would not lead to scalp and skin irritation due to being free of chemicals known to cause irritation, including paraben and sulfates.

88.     These uniform deceptive claims have been made and repeated across a variety of media including Defendant's Product's labels, websites and online promotional materials, and at the point-of-purchase, where they cannot be missed by consumers.

89.     In truth, Defendant's claims that DMDM hydantoin is a safe ingredient is false, misleading, and deceptive because the Product's ingredients, including DMDM hydantoin, were not safe, exposed consumers to formaldehyde, and caused skin and scalp irritation and hair loss. The Product was most certainly not "ideal for all hair and skin types", especially not safe or ideal for individuals that are sensitive to formaldehyde.

90.     Upon information and belief, Paul Mitchell knowingly permitted the manufacture and sale of the Product that was dangerous and unfit for sale as a body moisturizer and/or leave-in hair conditioner.

91.     Prior to placing the Product into the stream of commerce for sale to Plaintiff and the Class, Defendant was aware or should have been aware that the Product contained one or more unsafe ingredient, including DMDM hydantoin, that caused formaldehyde exposure, hair loss, and scalp irritation upon proper application and that any instructions and warnings provided with the Product directly to consumers were materially insufficient.

92.     Defendant knew or but for their reckless indifference would have known, prior to Plaintiff and the Class' purchase of the Product that they would continue to receive complaints of

19

hair loss and skin and/or scalp irritation attributed to the Product.

93.     Defendant knew, or but for their reckless indifference would have known, that: (a) the risk of skin and/or scalp irritation and hair loss was substantial, if not a certainty, (b) Paul Mitchell's customers were unaware of that substantial risk, and (c) those customers had a reasonable expectation that Paul Mitchell would not sell the Product under those conditions.

94.     Despite such knowledge, Defendant did not disclose to prospective purchasers that there was a substantial risk of formaldehyde exposure, skin reactions, scalp irritation and/or hair loss associated with use of the Product. Defendant instead continued to claim that the Product's ingredients, including DMDM hydantoin, were safe and did not include skin irritants like parabens or sulfates, all while concealing the adverse reports filed by consumers.

95.     The labels on the back of each Product perpetuate the false, deceptive and misleading representations and claims. As an example, the back label represents that the Product "will rejuvenate and hydrate" and was "ideal for all hair and skin types."

96.     However, despite the representation that the Product will "rejuvenate," "soothe," and is "ideal for all hair and skin types", the Product contain one or more harsh ingredients, including DMDM hydantoin, that leads to formaldehyde exposure, skin reactions, scalp irritation and hair loss.

97.     At the time of Plaintiff's and the Class members' purchase of the Product, Defendant had reinforced the false and deceptive claims that the Product soothed, rejuvenated and was irritant free through the websites of various authorized retailers, including on their own website, as seen in the example below:



MULTI-TASKING MOISTURIZER

Tingle from head to toe. This moisturizer for hair
and body contains tea tree oil, peppermint and
lavender to soothe skin and leave hair smelling
great. Use it as a body lotion to cool, rejuvenate
and hydrate skin or as a leave-in conditioner to
quench dry strands. Added bonus: It also makes a
great post-shave soother. Ideal for all hair and skin
types.

98.     Defendant intended for consumers to rely upon the representations on the Product's labels, and reasonable consumers, including Plaintiff and the Class, did, in fact, so rely. These representations are often the only source of information consumers can use to make decisions concerning whether to buy and use such products.

99.     Consumers lack the ability to test or independently ascertain the genuineness of product claims of normal everyday consumer products, especially at the point-of-sale. Reasonable customers must therefore rely on consumer product companies, such as Defendant, to honestly represent their products and the products' attributes on the products' labels.

100.    At all relevant times, Defendant directed the above-referenced Product's labels, statements, claims and innuendo-- including that the Product moisturized, hydrated, rejuvenated and soothed, and was "paraben and sulfate free" and safe in general-- to  Plaintiff and all Class Members in particular, as evidenced by their eventual purchases of the Product.

101. Plaintiff and Class Members did reasonably rely on Defendant's Product labels, statements, claims and innuendo in deciding to purchase the Product and were thereby deceived.

102. As a result of Defendant's deceptive labeling and/or marketing campaign, Defendant has caused Plaintiff and Class Members to purchase the Product, which contained one or more unsafe ingredients, including DMDM hydantoin, and does not safely moisturize, condition, or soothe the hair and skin. Plaintiff and Class Members have been harmed, as they would not have purchased the Product had they known the Product was not safe and could exposure them to formaldehyde, and could cause scalp irritation and hair loss.

103. As a result of Defendant's misconduct, Defendant was able to sell the Product to at least thousands of consumers throughout the United States— including Plaintiff and Class Members—and realized sizeable profits.

104. Plaintiff and Class Members were harmed and suffered actual damages in that Plaintiff and Class Members did not receive the benefit of their bargain as purchasers of the Product, which was represented as safely moisturizing, hydrating, rejuvenating, quenching and/or soothing the hair and body. Indeed, Plaintiff and Class Members did not receive the benefit of their bargain after purchasing the Product, as Plaintiff and Class Members paid for Product that was unsafe, exposed them to formaldehyde, caused skin reactions, scalp irritation and hair loss, was not ideal for their hair and skin type, and does not *safely* hydrate, moisturize and/or rejuvenate hair and skin.

105. Defendant developed and knowingly employed a labeling, advertising and/or marketing strategy designed to deceive consumers into believing that the Product contained safe ingredients and could *safely* moisturize, hydrate, rejuvenate, quench and/or soothe the hair and skin.

22

106.    The purpose of Defendant's scheme is to stimulate sales and enhance Defendant's profits.

107.    As the manufacturers, marketers, advertisers, distributors and/or sellers of the Product, Defendant possesses specialized knowledge regarding the Product and the ingredients contained therein. In other words, Defendants know exactly what is – and is not – contained in the Product, at what levels, and the potential dangers present at those levels.

108.    Defendant knew or should have known, but failed to disclose, that the Product contains one or more unsafe ingredients, including DMDM hydantoin, that leads to formaldehyde exposure and does not *safely* moisturize, hydrate, rejuvenate, quench and/or soothe the hair and skin as labeled and/or marketed by Defendants.

109.    Plaintiff and Class Members were, in fact, misled by Defendant's labeling, representations and marketing of the Product.

110.    The unsafe ingredient(s) and the inability of the Product to *safely* moisturize, hydrate, rejuvenate, quench and/or soothe the hair and skin leaves no reason to purchase this Product at all, since other proven and safer comparably priced products exist.

111.    The Product is defined as a "cosmetic" under 21 U.S.C.S. § 321(i) of the Federal Food Drug & Cosmetic Act ("FDCA").

112.    Defendant's deceptive statements violate 21 U.S.C.S. § 362(a), which deems a cosmetic product misbranded when the label contains a statement that is "false or misleading in any particular."

113.    The FDA promulgated regulations for compliance with the FDCA at 21 C.F.R. §§ 701 et seq. (for cosmetics).

114.    The introduction of misbranded cosmetics into interstate commerce is prohibited

under the FDCA and all parallel state statutes cited in this Complaint.

115.    Plaintiff and Class Members would not have purchased the Product had they known the Product contained one or more unsafe ingredients, led to formaldehyde exposure, was not ideal for their hair and skin type, and was incapable of *safely* moisturizing, hydrating, rejuvenating, quenching and/or soothing the hair and skin.

***Plaintiff's Factual Allegations***

116.    Plaintiff Lawrence Lattuca is and was at all times relevant to this matter a resident and citizen of the state of Illinois.

117.    Plaintiff purchased the Product on multiple occasions, dating back to approximately 2019.

118.    Plaintiff purchased the Product from authorized retailer Amazon, in addition to purchasing it from Great Clips hair salon. He purchased the Product for his personal use.

119.    Before purchasing the Product, Plaintiff reviewed information about the Product on the Product's labels. Plaintiff also reviewed information about the Product on Defendant's website and on Amazon's website where it included representations that the Product was "ideal for all hair and skin types" and "paraben and sulfate free".

120.    Indeed, prior to purchasing the Product, Plaintiff reviewed the accompanying disclosures, warranties, and marketing materials, and understood them as representations and warranties by Defendant that the Product was safe to moisturize, condition, or soothe the hair and skin. Plaintiff understood them as representations and warranties that the Product was ideal for all hair and skin types. Plaintiff also understood them as representations and warranties that the Product did not contain harmful skin and scalp irritants.

121.    Plaintiff relied on these representations and warranties in deciding to purchase

24

Defendant's Product. Accordingly, these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Product had he known these representations were not true.

122.    Here, Plaintiff did not receive the benefit of his bargain because Defendant's Product was not ideal for his hair and skin type.  The Product also included an ingredient that released formaldehyde, a very well-known skin irritant.  As such the Product was not *safe* to moisturize, condition, or soothe the hair and skin of Plaintiff. Plaintiff purchased the Product because he wanted a safe, hydrating hair conditioner that was irritant-free and good for his hair and skin type. Before using the Product, Plaintiff followed the instructions on the Product's label, as directed by Defendant.

123.    Plaintiff reasonably expected that the Product he purchased would not cause hair loss and/or scalp and skin irritation, especially in light of the claims that the Products were "paraben and sulfate free" and "ideal for all hair and skin types."

124.    Further, Plaintiff reasonably expected that if Paul Mitchell the company primarily responsible for developing, manufacturing, marketing and distributing the Product knew that the Product would or could lead to formaldehyde exposure and potentially cause hair loss and/or scalp irritation, Defendant would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

125.    As a result of his reliance on Defendant's misrepresentations and reasonable expectations of the Defendant, Plaintiff used the Product, was repeatedly exposed to formaldehyde, and developed skin and scalp irritation.

### ESTOPPEL FROM PLEADING AND
### TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

126.    Plaintiff and members of the Classes are within the applicable statute of limitation

for the claims presented herein. Defendant has knowledge and information detailing the Product's propensity to exposure users to formaldehyde and cause or contribute to hair loss, skin reactions, and/or scalp irritation, but failed to disclose this information to consumers, and Plaintiff and members of the Classes therefore could not reasonably have known that the Product would exposre them to formaldehyde or cause or contribute to hair loss and skin and/or scalp irritation. Rather, consumers relied upon Defendant's misrepresentations, including the statements on the Product's labeling as set forth above.

127.    Once Plaintiff incurred damages, he promptly acted to preserve his rights by filing this action. Defendant is estopped from asserting any statute of limitation defense that might otherwise be applicable to the claims asserted herein.

## FED. R. CIV. P. 9(b) ALLEGATIONS

128.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

129.    WHO: Defendant, John Paul Mitchell Systems, made material misrepresentations and/or omissions of fact in its labeling and marketing of the Product as to demonstrate that they are safe, gentle, and free of harsh ingredients.

130.    WHAT: Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Product would be ideal for their hair and skin type, would not exposure them to ingredients known to cause skin irritation, and would safely moisturize, condition, rejuvenate, hydrate, quench and soothe the hair and skin because of active ingredients including but not limited to tea tree oil.  Undisclosed by Defendant to Plaintiff

26

and Class Members and therefore unknown to Plaintiff and Class Members, the Product contains an ingredient or combination of ingredients that released formaldehyde, causes hair loss and skin and/or scalp irritation upon proper application. Defendant knew or should have known this information is material to the reasonable consumer and impacts the purchasing decision, and yet it omits a necessary warning that the Product has the propensity to cause hair loss, scalp irritation and other adverse reactions.

131.    WHEN: Defendant made material misrepresentations and/or omissions detailed herein continuously throughout the applicable Class periods.

132.    WHERE: Defendant's material misrepresentations and/or omissions were made on retailer websites, Defendant's website and on the labeling and packaging of its Product, which is sold nationwide and is visible to the consumer on the front of the labeling and packaging of the Product at the point of sale in every transaction.

133.    HOW: Defendant made written misrepresentations and/or failed to disclose material facts regarding the true risks of normal use of the Product.

134.    WHY: Defendant engaged in the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff and other reasonable consumers to purchase and/or pay for the Product. Defendant profited by selling the Product to many thousands of consumers.

## CLASS ACTION ALLEGATIONS

135.    Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **National Class**: All persons in the United States who purchased the Product.

**Consumer Fraud Multi-State Class**: All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Product.[35]

**Illinois Sub-Class**: All persons in the State of Illinois who purchased the Product.

136.    Excluded from the Classes are (a) any person who purchased the Product for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

137.    Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

138.    Numerosity – Federal Rule of Civil Procedure 23(a)(1). Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief,

---

[35] The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce within the State of Illinois. The States in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case as alleged herein: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201 et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); New Hampshire (N.H. Rev. Stat. § 358-A:1); New York, (N.Y. Gen Bus. Law Secs. 349 and 350); New Jersey (N.J. Stat. § 56:9-1, et seq.); Rhode Island (R.I. Gen. L. Ch. 6-13.1); Washington (Wash. Rev. Code § 19.86010, et seq.) and Wisconsin (WIS. STAT. § 100.18, et seq.).

there are thousands, if not hundreds of thousands, of putative Class Members. Moreover, the number of members of the Classes may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

139. Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

   a. Whether the Product contains the defect alleged herein;

   b. Whether Defendant failed to appropriately warn Class Members of the damage that could result from use of the Product;

   c. Whether Defendant had actual or imputed knowledge of the defect but did not disclose it to Plaintiff and the Classes;

   d. Whether Defendant promoted the Product with false and misleading statements of fact and material omissions;

   e. Whether Defendant's marketing, advertising, packaging, labeling, and/or other promotional materials for the Product are deceptive, unfair or misleading;

   f. Whether Defendant's actions violate the state consumer fraud statutes invoked below;

   g. Whether Defendant's actions and omissions violate Illinois law;

   h. Whether Defendant's conduct violates public policy;

   i. Whether Defendant's acts, omissions or misrepresentations of material facts constitute fraud;

   j. Whether Plaintiff and putative members of the Classes have suffered an ascertainable loss of monies or property or other value as a result of Defendant's acts, omissions or misrepresentations of material facts;

   k. Whether Defendant was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Product;

29

l.  Whether Plaintiff and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

m.  Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

140.    Pursuant to Rule 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to the putative Classes, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the putative Classes as a whole. In particular, Defendant has manufactured, marketed, advertised, distributed and sold Product that are deceptively misrepresented as being able to safely moisturize, hydrate, rejuvenate, condition, quench, and soothe the hair and skin.

141.    Typicality – Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Product and each sustained damages arising from Defendant's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by Defendant's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendant's deceptive misrepresentations regarding the ability of the Product to safely moisturize, hydrate, rejuvenate, condition, quench, and soothe the hair and skin as alleged herein.

142.    Adequacy – Federal Rule of Civil Procedure 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and

his counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

143. Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1). Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

144. Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to Plaintiff and all Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

145. Superiority – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

   a. The damages suffered by each individual members of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

   b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

   c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

     d.   Individual joinder of all members of the Classes is impracticable;

     e.   Absent a Class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Defendant's unlawful conduct; and

     f.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Defendant.

146.    In the alternative, the Classes may be certified for the following reasons:

     a.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant;

     b.   Adjudications of claims of the individual members of the Classes against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

     c.   Defendant has acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Violation Of State Consumer Fraud Acts
### (On Behalf Of The Multi-State Class)

147.    Plaintiff repeats and re-alleges all proceeding factual allegations above as if fully set forth herein.

148.    The Consumer Fraud Acts of the States in the Multi-State Class[36] prohibit the use

---

[36] The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce within the State of Illinois. The States in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case as alleged herein: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201 et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A et seq.); Michigan

of unfair or deceptive business practices in the conduct of trade or commerce.

149.    Defendant intended that Plaintiff and each of the other members of the Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

150.    Had the truth been known, Plaintiff and other Multi-State Class Members would not have purchased Defendant's Product, or would not have paid as much for the Product.

151.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Multi-State Class have sustained damages in an amount to be proven at trial.

152.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
### Violation of the Illinois Consumer Fraud Act
### (On Behalf of the Illinois Sub-Class, in the alternative to Count I)

153.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

154.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

155.    Plaintiff and other members of the Illinois Sub-Class, as purchasers of the Product,

---

(Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); New Hampshire (N.H. Rev. Stat. § 358-A:1); New York, (N.Y. Gen Bus. Law Secs. 349 and 350); New Jersey (N.J. Stat. § 56:9-1, et seq.); Rhode Island (R.I. Gen. L. Ch. 6-13.1); Washington (Wash. Rev. Code § 19.86010, et seq.) and Wisconsin (WIS. STAT. § 100.18, et seq.).

are consumers within the meaning of the ICFA given that Defendant's business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

156.    Defendant's conduct in misrepresenting the benefits of its Product constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendant's trade or commerce.

157.    Defendant also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff and other members of the Illinois Sub-Class knowing that consumers would rely on the advertisements and packaging and Defendant's uniform representations to purchase the Product.

158.    Once the defect in the Product and its tendency to cause hair loss, adverse skin reactions and/or scalp irritation despite proper application (or based upon foreseeable misapplication) became apparent to Defendant, consumers (Plaintiff and other members of the putative Illinois Sub-Class) were entitled to disclosure of that fact because a significant risk of hair loss and/or skin and scalp irritation would be a material fact in a consumer's decision-making process, and, without Defendant's disclosure consumers would not necessarily know that there is such a risk.

159.    Defendant intended that Plaintiff and the Illinois Sub-Class would rely on the continued deception by purchasing the Product, unaware of the material facts and omissions described above. Defendant knew that its customers would continue to rely on its representations that the Product was safe when used as directed, and knew that consumers would continue to rely upon its silence as to any known risk of hair loss and/or scalp irritation as evidence that the Product was safe. This conduct constitutes consumer fraud within the meaning of the ICFA.

160. Defendant's material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods, in violation of the ICFA.

161. Plaintiff and the other members of the Illinois Sub-Class suffered damages as a proximate result of the unfair acts or practices of Defendant alleged herein. Defendant's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

162. Plaintiff and other members of the Illinois Sub-Class would not have purchased the Product but for the promised benefits and concealment of any risk of harm because the Product as sold had no intrinsic value to them

163. Defendant knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Product.

164. As a proximate result of the above-described violations of the ICFA, Plaintiff and other members of the Illinois Sub-Class: (a) purchased and used the Product when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchasing the Product; and (c) suffered and/or will suffer additional economic losses in repairing and restoring the damage caused by the Product.

165. Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

166. Plaintiff also seeks to enjoin Defendant's ongoing deceptive practices relating to their claims on the Product's labels and advertising.

<u>**COUNT III**</u>
**Violation of the Illinois Uniform Deceptive Trade Practice Act**
**ILCS §§ 510/2, et seq.**
**(On Behalf of the Illinois Sub-Class, in the alternative to Count I)**

167.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

168.    Plaintiff brings this claim on behalf of herself and the Illinois Sub-Class for violations of the Illinois Uniform Deceptive Trade Practices Act, ILCS §§ 510/2, et seq.

169.    Defendant constitutes a "person" as defined by 815 ILCS §§ 510/1(5).

170.    Defendant engaged in deceptive trade practices in the conduct of their business, in violation of 815 ILCS §§ 510/2(a), including:

171.    Defendant represented to Plaintiff and the Class that the Product had approval or characteristics that it did not have;

172.    Defendant represented to Plaintiff and the Class that the Product was of a particular standard, quality, or grade when they were actually of another;

173.    Defendant advertised to Plaintiff and the Class goods with intent not to sell them as advertised;

174.    Defendant engaged in other fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding; and

175.    Defendant represented that consumers' purchases of the Product conferred or involved rights that the transactions did not have or involve.

176.    As described herein, Defendant repeatedly advertised, both on the Product labels and on its website and retailer websites, through a national advertising campaign, among other items, that the Product was a hair and skin conditioning Product, that the Product did not contain

known skin irritants, that the Product was ideal for all hair and skin types, and that the Product was safe to hydrate, rejuvenate, soothe and condition hair and skin.

177.    Contrary to these representations, the Product is not an appropriate hair and skin moisturizer product, exposes users to formaldehyde, is not ideal for all hair and skin types, includes a known skin irritant as an ingredient, and is not capable of *safely* hydrating, rejuvenating, moisturizing, or soothing hair and skin as described on the Product labels or in Defendant's uniform marketing and advertising campaign. Rather, the Product is defective because the inclusion of DMDM hydantoin exposes users to formaldehyde and therefore gives the Product the propensity to cause adverse reactions, such as hair loss, scalp redness, and scalp irritation, rendering the Product unsafe and unsuitable for consumer use as marketed by Defendant.

178.    Defendant had exclusive knowledge of material facts concerning the defective nature of the Product, including that they had the propensity to cause, and actually did cause, those adverse reactions.

179.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

180.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Sub-Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

181.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and Illinois Sub-Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing Defendant's Product, and increased

time and expense in treating damages caused by the Product.

182.    Plaintiff and Illinois Sub-Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

**COUNT IV**
**Fraud**
**(On Behalf of the Nationwide and/or**
**Illinois Sub-Class)**

183.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

184.    Plaintiff brings this cause of action on behalf of himself, the Nationwide Class and/or the Illinois Sub-Class against Defendant.

185.    As alleged herein, Defendant knowingly made material misrepresentations and omissions regarding the Product on the Product's labeling and packaging in the Product's advertisements, and/or on its website.

186.    Defendant made these material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Product.

187.    Rather than inform consumers that the Product contained a defect that exposed users to formaldehyde and caused hair loss and skin irritation upon proper application and did not otherwise perform as represented and for the particular purpose for which it was intended, Defendant claims in marketing materials and its marketing campaign for the Product that the Product was free of skin irritants like parabens and sulfate, was ideal for all hair and skin types, and would *safely* hydrate, rejuvenate, condition, quench, soothe, and moisturize in order to mislead consumers that the Product has the ability to safely moisturize and condition skin and/or hair.

188.    The inclusion of the defect that releases formaldehyde into the scalp and causes hair

loss and/or scalp irritation upon proper application renders the Product unable to safely hydrate, rejuvenate, condition, quench, or soothe the hair and skin.

189.    Defendant knew the Product was releasing formaldehyde and was therefore not ideal for all hair and skin types and was incapable of *safely* hydrating, rejuvenating, conditioning, quenching, or soothing the hair and skin, but nevertheless made such representations through the marketing, advertising and on the Product's labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Product.

190.    Had Plaintiff and the Class known the truth about the Product, they would not have purchased the Product.

191.    As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the putative Class paid monies to Defendant, through their regular retail sales channels, to which Defendant are not entitled, and have been damaged in an amount to be proven at trial.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of the Nationwide and/or**
**Illinois Sub-Class)**

192.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

193.    Plaintiff brings this cause of action on behalf of himself, and the putative Classes against Defendant.

194.    Plaintiff and putative Class Members conferred a benefit on Defendant when they purchased the Product, of which Defendant had knowledge. By its wrongful acts and omissions described herein, including selling the Product, which contain a defect that exposed users to

formaldehyde and caused hair loss upon proper application and did not otherwise perform as represented and for the particular purpose for which they were intended, Defendant was unjustly enriched at the expense of Plaintiff and putative Class Members.

195.    Plaintiff's detriment and Defendant's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

196.    Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and putative Class Members under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit. It would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the Product.

197.    Defendant has been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Product, which retention of such revenues under these circumstances is unjust and inequitable because Defendant manufactured defective Product, misrepresented the nature of the Product, misrepresented their ingredients, and knowingly marketed and promoted dangerous and defective Product, which caused injuries to Plaintiff and the Class because they would not have purchased the Product based on the same representations if the true facts concerning the Product had been known.

198.    Plaintiff and putative Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased the Product on the same terms or for the same price had they known the true nature of the Product and the mis-statements regarding what the Product was and what it contained.

199.    Defendant either knew or should have known that payments rendered by Plaintiff and putative Class Members were given and received with the expectation that the Product was

irritant free, ideal for all hair and skin types, and able to *safely* hydrate, rejuvenate, condition, quench, or sooth the hair and skin as represented by Defendant in advertising, on Defendant's websites, and on the Product's labels and packaging. It is inequitable for Defendant to retain the benefit of payments under these circumstances.

200. Plaintiff and putative Class Members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant.

201. When required, Plaintiff and Class Members are in privity with Defendant because Defendant's sale of the Product was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendant's agents for the purpose of the sale of the Product.

202. As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for their inequitable and unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A. Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B. Directing that Defendant bear the costs of any notice sent to the Class(es);

C. Declaring that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Product, or order Defendant to make full restitution to Plaintiff and the members of the Class(es);

D. Awarding restitution and other appropriate equitable relief;

E.  Granting an injunction against Defendant to enjoin it from conducting its business through the unlawful, unfair and fraudulent acts or practices set forth herein;

F.  Granting an Order requiring Defendant to fully and appropriately recall the Product, to remove the claims on its website and elsewhere that the Product is safe to use and ideal for all hair and skin types, and to fully and properly disclose the safety risks associated with the Product to anyone who may still be at risk of buying and using the Product;

G.  Ordering a jury trial and damages according to proof;

H.  Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.  Enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.  Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K.  Awarding civil penalties, prejudgment interest and punitive damages as permitted by law; and

L.  Ordering such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: May 1, 2023                    Respectfully submitted,

**LAUKAITIS LAW FIRM LLC**

*/s/ Kevin Laukaitis*
Kevin Laukaitis
111 North Wabash Ave. Ste. 100 #558
The Garland Building
Chicago, IL 60602
215-789-4462
Email: klaukaitis@ecf.courtdrive.com

Melissa K. Sims (IL Bar #6231297)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
111 West Jackson Boulevard

42

Suite 1700
Chicago, Illinois 60604
T: 8158784674
Msims@milberg.com

Harper T. Segui*
Erin J. Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
hsegui@milberg.com
eruben@milberg.com

Andrew J. Sciolla*
**SCIOLLA LAW FIRM, LLC**
Land Title Building
100 S. Broad Street, Suite 1910
Philadelphia, PA 19110
T: 267-328-5245
F: 215-972-1545
andrew@sciollalawfirm.com

*Admitted Pro Hac Vice*

43

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing

**Plaintiff's First Amended Class Action Complaint** was served on the following individuals on this

1st day of May 2023 via the Court's ECF system and also by electronic mail:

Stephen P. Benson
Kimberly A. Beis
**FREEBORN & PETERS LLP**
311 S. Wacker Dr.
Chicago, Illinois 60606
312-360-6000
sbenson@freeborn.com
kbeis@freeborn.com
Counsel for Defendant


*Submitted By:*


<u>*Andrew J. Sciolla*</u>
**SCIOLLA LAW FIRM, LLC**
Land Title Building
100 S. Broad Street, Suite 1910
Philadelphia, PA 19110
T: 267-328-5245
F: 215-972-1545
andrew@sciollalawfirm.com
*Admitted Pro Hac Vice*